200 P.3d 232 (2009)
Armen YOUSOUFIAN, Respondent,
v.
The OFFICE OF Ron SIMS, King County Executive, a subdivision of King County, a municipal corporation; The King County Department of Finance, a subdivision of King County, a municipal corporation; and The King County Department of Stadium Administration, a subdivision of King County, a municipal corporation, Petitioner.
No. 80081-2.
Supreme Court of Washington, En Banc.
Argued February 26, 2008.
Decided January 15, 2009.
*233 Stephen Paul Hobbs, King County Prosecutor's Office, Seattle, WA, for Petitioner.
Michael G. Brannan, Law Office of Michael G. Brannan, Edmonds, WA, Rand F. Jack, Brett & Coats, Bellingham, WA, for Respondent.
Michele Lynn Earl-Hubbard, Allied Law Group, LLC, Seattle, WA, for Amicus Curiae on behalf of Allied Daily Newspapers of Washington.
*234 SANDERS, J.
¶ 1 We are asked once again to determine the appropriate application of RCW 42.56.550(4) (formerly RCW 42.17.340), requiring penalties for a state agency's failure to timely produce public records. Specifically, we decide whether the trial court abused its discretion by imposing a $15 per day penalty in response to King County's grossly negligent noncompliance with the Public Records Act (PRA).[1] Under the facts of this case we hold the trial court abused its discretion by imposing a penalty at the low end of the PRA penalty range. Accordingly, we remand to the trial court with directions to recalculate the penalty in accordance with the guidance set forth in part III. A of this opinion.[2] Consequently, we affirm but modify the decision of the Court of Appeals.

I
¶ 2 The facts found by the original trial judge are unchallenged and the subject of three published opinions. See Yousoufian v. Office of King County Executive, 114 Wash. App. 836, 840-46, 60 P.3d 667 (2003) (Yousoufian I), aff'd part, rev'd in part by Yousoufian v. Office of King County Executive, 152 Wash.2d 421, 98 P.3d 463 (2005) (Yousoufian II); Yousoufian II, 152 Wash.2d at 425-29, 98 P.3d 463; Yousoufian v. Office of Ron Sims, 137 Wash.App. 69, 71-75, 151 P.3d 243 (2007) (Yousoufian III). Unchallenged findings of fact are "verities on appeal." Davis v. Dep't of Labor & Indus., 94 Wash.2d 119, 123, 615 P.2d 1279 (1980).
¶ 3 On May 30, 1997, Armen Yousoufian submitted a PRA request to the Office of the Executive of King County after Yousoufian heard King County Executive Ron Sims speak about the upcoming referendum election in which voters would decide on June 17 whether to finance $300 million for a new football stadium in Seattle. Sims referred to several studies regarding the impact of sports stadiums on the local economy. One of these studies was called the "Conway study." Yousoufian asked to review all material relating to the Conway study and any other such studies, including a restaurant study concerning the effects of a fast food tax. Yousoufian's PRA request was forwarded to office manager Pam Cole for a response.
¶ 4 On June 4, 1997, Cole acknowledged receipt of Yousoufian's PRA request, stating the Conway study was available for review, but archives would have to be searched for other responsive documents. Cole said the archive search would take approximately three weeks; however, before sending this response Cole never inquired into the location of responsive documents. The trial judge found "much of Yousoufian's [PRA] request involved documentation not yet stored in Archives." Clerk's Papers (CP) at 31. On June 10 Yousoufian reviewed the Conway study as well as another study.
¶ 5 The referendum was held on June 17 while most of the requested information was still withheld. On June 20, 1997, Yousoufian sent a letter to the Office of the Executive of King County protesting the three-week delay for the remaining documents responsive to his request. Yousoufian's letter pointed out one study in particular should not be already archived because the tax it analyzed was recently passed. Cole responded and directed Yousoufian to request that study from the Washington State Restaurant Association. Cole's letter also stated she would contact Yousoufian the following week regarding the rest of his request. The trial judge found nothing to indicate Cole ever followed up with Yousoufian.
*235 ¶ 6 Meanwhile, on June 12, 1997, Linda Meachum, who took over responsibility from Cole for managing Yousoufian's PRA request, contacted Susan Clawson in the King County Department of Stadium Administration, asking her to search for responsive documents. Clawson delegated this task to Steve Woo, her administrative assistant. Woo had no knowledge of the PRA or its requirements and was never trained in how to respond to a PRA request. Meachum never followed up with Clawson to ensure an adequate response.
¶ 7 On July 15, 1997, Woo spoke with Yousoufian by telephone, informing him of a second, earlier Conway study. On July 25, 1997, Woo sent Yousoufian the earlier Conway study along with cost information about this Conway study and another study commissioned by King County. Woo did not include any cost documentation, which Yousoufian requested, and the cost information Woo provided was incorrect. The trial judge found it "apparent from the correspondence that [Woo] did not carefully read or reasonably understand [Yousoufian's PRA] request." CP at 35.
¶ 8 On August 21, 1997, Yousoufian wrote the Office of the Executive of King County to reiterate his request for cost documentation. In response to this letter, Woo permitted Yousoufian to view four more studies. The trial judge found Woo incrementally released information, rather than all at once, even after he realized Yousoufian's request was for all information.
¶ 9 On August 27, 1997, the Office of the Executive responded to Yousoufian's letter stating it interpreted all PRA requests as requests for records located within that office and any coordination with other agencies was a gratuity. The letter stated Meachum was searching the archives and asked if Yousoufian would like the stadium administration to search their archives as well. The trial judge found, "[i]t was not reasonable to ask [Yousoufian] where to search for the documents responsive to his request." CP at 36.
¶ 10 On October 2, 1997, Yousoufian sent yet another letter reiterating his request for cost documentation. Meachum responded on October 9 stating her office had provided all the documents in its possession pertaining to Yousoufian's May 30 request. Meachum admonished Yousoufian to be more specific in future PRA requests. On the same day, Yousoufian received another letter from the Office of the Executive notifying him that the archival search had been performed and responsive documents were being forwarded to King County's attorneys for review. This letter estimated the documents would be available within two weeks. Yet, there was no evidence an archival search was ever performed, or if one was performed why it took so long. Also on October 9 Woo faxed a letter to Yousoufian explaining more studies could be found on the King County web site. On October 10 Woo sent Yousoufian two more studies, but he again failed to provide cost documentation.
¶ 11 On October 14, 1997, Yousoufian complained about the conflicting communications he was receiving from different county employees. Oma LaMothe, a King County deputy prosecuting attorney, replied to state she had reviewed Yousoufian's original request and believed it had been fully answered. She stated the archive search had been completed and two boxes of documents had been retrieved that she believed were not relevant to Yousoufian's original request, but she invited Yousoufian to view the documents. She ended the letter by commenting on her difficulty in interpreting Yousoufian's PRA request. However, the trial judge found Yousoufian's request was neither vague nor ambiguous, but clear on its face. Additionally, the trial court found at no time did anyone from King County ask Yousoufian to clarify his request.
¶ 12 On October 28, 1997, Yousoufian viewed the two boxes of documents. He made several attempts to arrange a time to view them sooner, but he was allowed to view them only during office hours in the presence of particular staff members.
¶ 13 After determining he had still not received all the documents he requested Yousoufian hired an attorney. On December 8, 1997, Yousoufian's attorney wrote to once again reiterate Yousoufian's original PRA request. This letter reiterated the types of *236 records Yousoufian sought, including contracts and bills for the studies, bidding documents, and memos discussing the consultants who conducted the studies.
¶ 14 On December 10 Cole e-mailed Woo and others to request the documentation. On December 12 Woo responded, listing the documents he had already provided and stating he had completely responded to Yousoufian's request. The trial court found Woo's statement "demonstrated his ignorance of the initial request." CP at 38. Moreover, Woo indicated he would generate the additional information regarding cost documentation, but the trial judge found nothing to indicate Woo ever did so.
¶ 15 On December 15, 1997, John Wilson, Sims's chief of staff, wrote Yousoufian's attorney outlining the documents King County previously disclosed. Wilson told Yousoufian to direct any further requests for information to the public facility district. On December 31, 1997, Yousoufian's attorney responded, requesting disclosure of documents responsive to Yousoufian's original request, protesting the county's unresponsiveness, and warning Yousoufian would file a lawsuit if his request continued to be ignored. On January 14, 1998, LaMothe responded, stating the Office of the Executive was only responsible for providing documents within its office and that "`hundreds of hours'" had already been spent responding to Yousoufian's PRA request. CP at 39. The trial judge found this response by LaMothe to be "factually and legally incorrect." Id.
¶ 16 Yousoufian's attorney again wrote back, reiterating the request for the documents, but this time asking to be directed to the appropriate office if the records were housed elsewhere. LaMothe responded and advised Yousoufian to write the finance department. On April 29, 1998, Yousoufian's attorney sent a PRA request to the finance department. After receiving no response, he sent another letter on June 8, 1998. On June 22, 1998, LaMothe wrote back, this time on behalf of the finance department, stating the department did not have the requested documents. But the trial judge found the finance department did, in fact, have the records.
¶ 17 Yousoufian filed this lawsuit on March 30, 2000. In February 2001, another county employee, Pat Steel, was asked to assist in locating documents responsive to Yousoufian's request. Steel proceeded to locate a number of records in the Department of Finance not earlier disclosed because of the department's inability to retrieve records by subject. By April 20, 2001, Yousoufian finally received all the studies and cost documentation he originally requested on May 30, 1997.
¶ 18 To summarize, the unchallenged findings of fact demonstrate King County repeatedly deceived and misinformed Yousoufian for years. King County told Yousoufian it produced all the requested documents, when in fact it had not. King County told Yousoufian archives were being searched and records compiled, when in fact they were not. King County told Yousoufian the information was located elsewhere, when in fact it was not. After years of delay, misrepresentation, and ineptitude on the part of King County, Yousoufian filed suit; nevertheless, it would still take another year for King County to completely and accurately respond to Yousoufian's original request, well past the purpose of his request, the referendum on public financing of a sports stadium.
¶ 19 According to the first trial court, "the County was negligent in the way it responded to [Yousoufian's PRA] request at every step of the way, and this negligence amounted to a lack of good faith." CP at 46. "[Yousoufian's] requests were clear and the County had an obligation to respond to them in a prompt and accurate manner," yet King County's personnel were inadequately trained to handle PRA requests, and King County failed to coordinate any effort to comply with Yousoufian's PRA request. CP at 40. The trial court found King County could have complied with Yousoufian's PRA request within "five business days" following Yousoufian's initial request; nevertheless, the trial court found King County did not act in "`bad faith' in the sense of intentional nondisclosure." CP at 45.
¶ 20 The first trial court originally calculated the PRA penalty at $5 per day, the lowest possible penalty. Yousoufian appealed and *237 the Court of Appeals reversed, holding the trial court abused its discretion to impose the minimum daily penalty in light of King County's gross negligence. Yousoufian I, 114 Wash.App. at 854, 60 P.3d 667. On review this court agreed the minimum daily penalty "was unreasonable considering that the county acted with gross negligence." Yousoufian II, 152 Wash.2d at 439, 98 P.3d 463. We remanded to the trial court to impose an appropriately higher penalty.
¶ 21 On remand the trial court calculated the PRA penalty at $15 per day. Yousoufian again appealed, and the Court of Appeals again reversed. Yousoufian III, 137 Wash. App. at 80, 151 P.3d 243. The Court of Appeals proposed tiering the penalty scale based on the degrees of culpability found in the Washington Pattern Jury Instructions. Id. at 78-80, 151 P.3d 243. King County petitioned for discretionary review, which we granted. Yousoufian v. Office of Ron Sims, 162 Wash.2d 1011, 175 P.3d 1095 (2008).

II

A
¶ 22 "[T]he trial court's determination of appropriate daily penalties is properly reviewed for an abuse of discretion." Yousoufian II, 152 Wash.2d at 431, 98 P.3d 463. The trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or reasons. Mayer v. Sto Indus., Inc., 156 Wash.2d 677, 684, 132 P.3d 115 (2006). A trial court's decision is "`manifestly unreasonable' if `the court, despite applying the correct legal standard to the supported facts, adopts a view that no reasonable person would take.'" Id. (internal quotation marks omitted) (quoting State v. Rohrich, 149 Wash.2d 647, 654, 71 P.3d 638 (2003)).

B
¶ 23 Determining a PRA penalty involves two steps: "(1) determine the amount of days the party was denied access and (2) determine the appropriate per day penalty between $5 and $100 depending on the agency's actions."[3]Yousoufian II, 152 Wash.2d at 438, 98 P.3d 463. Step 1 was decided in Yousoufian II, 152 Wash.2d at 440, 98 P.3d 463. The issue now is whether the $15 per day penalty is appropriate under these circumstances.[4]
¶ 24 The PRA penalty is designed to "`discourage improper denial of access to public records and [encourage] adherence to the goals and procedures dictated by the statute.'" Yousoufian II, 152 Wash.2d at 429-30, 98 P.3d 463 (alteration in original) (quoting Hearst Corp. v. Hoppe, 90 Wash.2d 123, 140, 580 P.2d 246 (1978)). "When determining the amount of the penalty to be imposed the `existence or absence of [an] agency's bad faith is the principal factor which the trial court must consider.'" Amren v. City of Kalama, 131 Wash.2d 25, 37-38, 929 P.2d 389 (1997) (alteration in original) (quoting Yacobellis v. City of Bellingham, 64 Wash. App. 295, 303, 825 P.2d 324 (1992)). However, no showing of bad faith is necessary to penalize an agency, nor does an agency's good faith reliance on an exemption exonerate the agency from the penalty. Id. at 36-37, 929 P.2d 389.
*238 ¶ 25 The dichotomy of good faith and bad faith, therefore, merely establishes the bookends of the penalty. Yousoufian II, 152 Wash.2d at 435, 438, 98 P.3d 463. But there are other considerations as well; in Yousoufian II eight justices of this court agreed agency culpability is a major factor in determining the PRA penalty. Id. at 438, 98 P.3d 463 ("determine the appropriate per day penalty... depending on the agency's actions"); id. at 441, 98 P.3d 463 (Fairhurst, J., concurring) ("the trial court should determine the proper amount of the penalty based on the agency's culpability"); id. at 446-47, 98 P.3d 463 (Sanders, J., concurring in part, dissenting in part) (positing a penalty based on factors including culpability).
¶ 26 Setting the penalty at $15 per day, the trial court analogized King County's conduct to that of the school district in American Civil Liberties Union v. Blaine School District No. 503, 95 Wash.App. 106, 975 P.2d 536 (1999) (ACLU). In ACLU the Court of Appeals held a penalty of $10 per day was appropriate where the school district did not act in good faith.[5]Id. at 115, 975 P.2d 536. The school district refused to mail documents that amounted to 13 pages to the ACLU because it incorrectly interpreted the PRA as not requiring it to mail its response. Id. at 109, 975 P.2d 536. Instead, the school district made the requested documents available for viewing during business hours. Id. To calculate the penalty, the Court of Appeals observed the school district refused to mail the documents because it wished to avoid the cost and inconvenience of complying with the PRA. Id. at 114, 975 P.2d 536. According to ACLU, because the district did not act in good faith, a $10 per day penalty was appropriate. Id. at 115, 975 P.2d 536.
¶ 27 However, after our decision in Yousoufian II, a strict and singular emphasis on good faith or bad faith is inadequate to fully consider a PRA penalty determination. Yousoufian III, 137 Wash.App. at 78-79, 151 P.3d 243 (noting Yousoufian II and stating, "a simple emphasis on the presence or absence of an agency's bad faith does little more than to suggest what the two poles are on the penalty range and is inadequate to guide the trial court's discretion in locating violations that call for a penalty somewhere in the middle of the expansive range the legislature has provided").
¶ 28 Moreover, the conduct in ACLU, promptly making records available but refusing to mail them, is fundamentally different from King County's conduct. The trial court should not have viewed ACLU as the guiding precedent to calculate King County's penalty. In addition to ACLU the trial court also considered two factors, economic loss and public harm.
¶ 29 This Court has stated economic loss is a relevant factor. Amren, 131 Wash.2d at 38, 929 P.2d 389 (citing Yacobellis, 64 Wash.App. at 303, 825 P.2d 324). As Yousoufian points out, however, the harm suffered by PRA noncompliance is the same regardless of economic loss: the denial of access to public records and the lack of governmental transparency. The penalty's purpose is to promote access to public records and governmental transparency; it is not meant as compensation for damages. Yousoufian II, 152 Wash.2d at 429, 435, 98 P.3d 463; see also Yacobellis, 64 Wash.App. at 301, 825 P.2d 324. At most, actual economic loss calls for a higher penalty, but the absence of economic damages does not call for a lower one.
¶ 30 As to the second factor considered by the trial court, the court correctly reasoned governmental intransigence on an issue of public importance is relevant. King County agrees the penalty should reflect the significance of the project to which the PRA request relates. However, the trial court and King County go too far by requiring actual public harm.
¶ 31 The proper formulation of the factor is the potential for public harm; assessing a penalty under the PRA should not be contingent on uncovering the proverbial smoking gun, but whether there is the potential for public harm. See RCW 42.56.030 ("The people *239 insist on remaining informed so that they may maintain control over the instruments that they have created."). Here, the requested records dealt with a $300 million, publicly financed project that was subject to referendum, where time was of the essence. The potential for public harm is obvious; however, the lack of actual public harm is irrelevant to penalizing King County for its misconduct. See Spokane Research & Def. Fund v. City of Spokane, 155 Wash.2d 89, 100, 117 P.3d 1117 (2005) ("We interpret the PRA liberally to promote full disclosure of government activity that the people might know how their representatives have executed the public trust placed in them and so hold them accountable.").
¶ 32 Finally, the trial court failed to consider deterrence as a factor to determine the penalty. The purpose of the PDA's penalty provision is to deter improper denials of access to public records. Yousoufian II, 152 Wash.2d at 429-30, 98 P.3d 463. The penalty must be an adequate incentive to induce future compliance. King County agrees deterrence is a factor. Yet nowhere does the trial court mention deterrence.
¶ 33 As Yousoufian points out, the trial court implicitly averted the deterrence factor by analogizing to ACLU. In ACLU the agency in question was a small school district, but King County is the wealthiest county in the state. What it takes to deter a small school district and what it takes to deter the wealthiest county in the state may not be the same thing.
¶ 34 To conclude, the trial court on remand recognized King County's grossly negligent noncompliance with the PRA but failed to impose a penalty proportionate to King County's misconduct, imposing instead a penalty at the extreme low end of the penalty range. As recognized in Yousoufian II such a low penalty is inappropriate and manifestly unreasonable in light of King County's extreme misconduct. Yousoufian II, 152 Wash.2d at 439, 98 P.3d 463.

III

A
¶ 35 Because we hold the trial court abused its discretion, but decline King County's invitation to set the penalty ourselves, we take this opportunity to provide guidance to the trial court when determining a PRA penalty. This guidance is not meant to limit the trial court's discretion.[6] To the contrary, appellate courts frequently guide trial court discretion so as to render those decisions consistent and susceptible to meaningful appellate review. See Bowers v. Transamerica Title Ins. Co., 100 Wash.2d 581, 595, 675 P.2d 193 (1983).
¶ 36 For example, in Bowers this Court adopted an analytical framework to calculate reasonable attorney fees under the Consumer Protection Act, chapter 19.86 RCW. 100 Wash.2d at 593-99, 675 P.2d 193. Before providing its guidance the Court noted the Consumer Protection Act "provide[d] no specific indication of how attorney fees [were] to be calculated," but recognized the Consumer Protection Act exhorted it "to liberally construe the act, `that its beneficial purposes may be served'." Id. at 594, 675 P.2d 193 (quoting RCW 19.86.920).
¶ 37 Similarly, here the PRA provides no specific indication of how the penalty is to be calculated. However, the PRA exhorts us to liberally construe it "to assure that the public interest will be fully protected." RCW 42.56.030. The PRA is a "strongly worded mandate for broad disclosure of public records." Hearst Corp. v. Hoppe, 90 Wash.2d 123, 127, 580 P.2d 246 (1978); see also RCW 42.56.030. The PRA's mandate is unequivocal: "Responses to requests for public records shall be made promptly by agencies...." RCW 42.56.520 (emphasis added). The PRA is a forceful *240 reminder that agencies remain accountable to the people of the State of Washington:
[t]he people of this state do not yield their sovereignty to the agencies that serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may maintain control over the instruments that they have created.
RCW 42.56.030.
¶ 38 To begin, the trial court must consider the entire penalty range established by the legislature. See Laws of 1992, ch. 139, § 8 (amending the penalty from a $25 per day limit to the current $5-100 per day range). Taking into account the entire penalty range fulfills the legislative objective by reserving the extremes for the most and least culpable conduct, allowing the rest to fall somewhere in between.
¶ 39 In addition, considering the entire penalty range eliminates the perception of bias associated with presuming the lowest penalty. Because the minimum penalty is mandatory for violations regardless of an agency's good faith efforts, starting from the lowest penalty presumes the least violative conduct. The PRA does not support that presumption. See RCW 42.56.550(1) (placing the burden of proof upon the state agency to show its compliance).
¶ 40 Courts should bear in mind the following factors, which may overlap and are not meant to comprise an exclusive list of considerations. Factors that can serve to mitigate the penalty are (1) the lack of clarity of the PRA request; (2) an agency's prompt response or legitimate follow-up inquiry for clarification[7]; (3) good faith,[8] honest, timely, and strict compliance with all the PRA procedural requirements and exceptions; (4) proper training and supervision of personnel; (5) reasonableness of any explanation for noncompliance; (6) helpfulness of the agency to the requestor;[9] and (6) the existence of systems to track and retrieve public records.
¶ 41 Conversely, aggravating factors that increase a penalty are (1) a delayed response, especially in circumstances making time of the essence[10]; (2) lack of strict compliance with all the PRA procedural requirements and exceptions; (3) lack of proper training and supervision of personnel and response; (4) unreasonableness of any explanation for noncompliance; (5) negligent, reckless, wanton, bad faith, or intentional noncompliance with the PRA; (6) dishonesty; (7) potential for public harm, including economic loss or loss of governmental accountability[11]; (8) personal economic loss; and (9) a penalty amount necessary to deter future misconduct considering the size of the agency and the facts of the case.[12]
¶ 42 As discussed above this court already recognizes some of these factors: the endpoints of good faith and bad faith, deterrence, the public interest, economic loss, and compliance with the PRA procedures. Providing this analytical framework guides the trial court's discretion "in light of the complex issues and circumstances presented" without substituting the opinion of the appellate *241 judge. Yousoufian II, 152 Wash.2d at 450, 98 P.3d 463 (Chambers, J., dissenting).
¶43 In sum, the legislature established a penalty range between $5 and $100 a day to contrast between the least and the most violative conduct, expecting extreme cases to fall at either endpoint with the rest falling in between. Our multifactor analysis is consistent with the PRA and our precedents and provides guidance to the trial court, more predictability to the parties, and a framework for meaningful appellate review.

B
¶44 The Court of Appeals in Yousoufian III proposed a tiered approach based on degrees of culpability. 137 Wash.App. at 78, 151 P.3d 243. Under this approach the culpability tiers provide the baseline from which the trial court applies other factors to determine the appropriate penalty. Id. at 80, 151 P.3d 243.
¶45 Both parties point out the shortcomings of this approach: culpability definitions do not lend themselves to the complexity of a PRA penalty analysis. The parties agree a nuanced multifactored approach is more appropriate to a PRA penalty determination. King County, however, argues trial courts are sufficiently guided by the current good faith/bad faith dichotomy.
¶46 King County's argument is unpersuasive for two reasons. First, only three published cases have reviewed a penalty for its sufficiency: Lindberg v. Kitsap County, 133 Wash.2d 729, 746-47, 948 P.2d 805 (1997) (upholding a trial court's order awarding a combination of attorney fees and penalties); ACLU, 95 Wash.App. 106, 975 P.2d 536; Yousoufian II, 152 Wash.2d 421, 98 P.3d 463. Given the paucity of published cases after 35 years of PRA case law, a piecemeal approach insufficiently addresses the current need for guidance. See Zink v. City of Mesa, 140 Wash.App. 328, 348, 166 P.3d 738 (2007) (remanding for penalty determination "in an amount [the trial court] determines to be appropriate in light of the relevant circumstances").
¶47 Second, King County ignores the procedural history of this case. This is the second time this court has reviewed the sufficiency of the penalty. This review provides the appropriate opportunity to set forth relevant considerations to guide a trial court's penalty determination. Cf. Progressive Animal Welfare Soc'y v. Univ. of Wash., 125 Wash.2d 243, 272, 884 P.2d 592 (1994) (declining to create a penalty standard because of the procedural posture of the case).

C
¶48 Applying our guidance to these facts shows no mitigating factors but many aggravating ones. King County failed to reply to Yousoufian's clear request promptly or accurately. King County failed to train its responding personnel or supervise its response. King County did not comply strictly to the procedures set forth in RCW 42.56.520, failing to seek clarification from Yousoufian when necessary, failing to give any reason for its delay, failing to set forth an exception for its refusal, failing to provide any estimate of its delayed response time, and making Yousoufian contact King County more than 11 times over the course of two years to obtain the requested information when under the statute only one request should suffice. See RCW 42.56.520. King County either made no explanation of its noncompliance or misrepresented the truth. As the trial judge found, with proper diligence and attention, King County could have responded accurately to Yousoufian within five days. The potential for public harm was high; the requested records tested the veracity of King County's assertions regarding a pending referendum on a $300 million public financing scheme. The request was time-sensitive, seeking documents relevant to the upcoming referendum, whereas the disclosure of these documents was delayed years beyond the election day without justification.[13]
*242 ¶49 Finally, proper deterrence for King County and others clearly requires a penalty at the high end of the penalty range.[14]

IV
¶50 Yousoufian properly requests an award of attorney fees and costs incurred in connection with this appeal. See RAP 18.1(a). RCW 42.56.550(4) authorizes "all costs, including reasonable attorney fees" to be awarded to "[a]ny person who prevails" in a PRA case. Yousoufian is entitled to an award of all reasonable attorney fees and costs incurred in connection with this appeal plus a supplemental award to be calculated by the trial court for additional fees and expenses incurred on remand. RCW 42.56.550(4).

V
¶51 We affirm, but modify, the Court of Appeals' decision, and remand this case to the trial court for recalculation of the penalty consistent with this opinion plus all reasonable attorney fees and expenses incurred by Yousoufian on remand.[15]
WE CONCUR: CHARLES W. JOHNSON, MARY E. FAIRHURST and JAMES M. JOHNSON, Justices.
CHAMBERS, J. (concurring).
¶52 I agree with Justice Sanders' analysis of the factors the trial court should consider in determining a penalty for violating the Public Records Act, chapter 42.56 RCW.[1] I also agree that we should remand to the trial court to reconsider in light of the factors the majority has laid out. But I do not believe that Judge Learned abused her discretion the first time this case was before us, and I do not believe that Judge Hayden, conventionally speaking, abused his discretion on remand. Yousoufian v. Office of Ron Sims, 152 Wash.2d 421, 449-50, 98 P.3d 463 (2004) (Chambers, J., concurring and dissenting). However, neither of those able trial judges had the benefit of the analytical framework the court provides today, and I concur that remand is appropriate.
¶53 The real dispute between the majority, the dissent, and the concurrence/dissent is over the amount of deference to give the trial court. The amount of deference given to trial courts is closely related to the comparative institutional competency of the different types of courts. Appellate courts in general and the state supreme courts in particular are uniquely competent to interpret the law, especially state statutes. Therefore we give no deference to lower courts on issues of law and review them de novo. Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 149 Wash.2d 660, 670, 72 P.3d 151 (2003). However, we recognize that trial judges are uniquely competent to assess the credibility of live witnesses and to weigh conflicting evidence. We give trial courts great deference on issues of fact based upon trial testimony and review only for abuse of discretion or substantial evidence. Braam ex rel. Braam v. State, 150 Wash.2d 689, 706, 81 P.3d 851 (2003) (citing Davis v. Globe Mach. Mfg. Co., 102 Wash.2d 68, 76, 684 P.2d 692 (1984)); Soltero v. Wimer, 159 Wash.2d 428, 433, 150 P.3d 552 (2007) (citing Nordstrom Credit, Inc. v. Dep't of Revenue, 120 Wash.2d 935, 942, 845 P.2d 1331 (1993)). *243 When questions are mixed questions of law and fact or when facts are determined from a written record, we effectively give less deference. For example, if the question is whether or not there are genuine issues of fact to overcome a motion for summary judgment, the question is a mixed question of fact and law. We feel uniquely qualified to interpret the law and equally competent to the trial court in determining the facts from a written record. We review whether or not there are genuine issues of fact for purposes of summary judgment de novo. Hearst Commc'ns, Inc. v. Seattle Times Co. 154 Wash.2d 493, 501, 115 P.3d 262 (2005) (citing Trimble v. Wash. State Univ., 140 Wash.2d 88, 92, 993 P.2d 259 (2000)).
¶54 Setting the appropriate penalty for a Public Records Act, chapter 42.56 RCW, violation requires judgments on both fact and law. It is wholly appropriate for this court to interpret the statute and establish the factors to be considered in assessing such penalties. It is also appropriate for this court to give guidance, as the majority has, where along a scale of penalties a particular set of facts should fall to promote consistency and predictability.
¶55 Trial court discretion does not mean that each judge is entitled to impose his or her subjective view of what an appropriate penalty should be. Guidance from this court is important. It is my view that the facts of this case would put it at least in the upper half of the range of penalties the legislature has provided. I would reserve the most severe penalties for intentional nondisclosure. However, it is also my view that it is inappropriate for an appellate judge to impose his or her subjective view of an appropriate penalty. Now that we have interpreted the law, the trial judge who has heard the evidence is more competent to assess the relevant facts and apply the law than we are. It is appropriate to remand to the able trial judge to reconsider in light of the factors and guidance we have established to determine where along the scale the legislature has given us the facts of this case fall. With these additional thoughts, I concur with the majority.
J.M. JOHNSON, J. (concurring).
¶56 I agree with the majority that the trial court's imposition of a low end penalty for King County's egregious violation of the Public Records Act (PRA) (former chapter 42.17 RCW, recodified as chapter 42.56 RCW) was manifestly unreasonable. I write separately only to emphasize that the penalty imposed on remand should approach, if not reach, the maximum statutorily allowed.
¶57 Over 10 years ago, King County officials improperly withheld records directly relevant to an important public vote involving millions of dollars. The clear intent of our public disclosure initiative, Initiative 276, recodified in chapter 42.56 RCW and updated as to dollar amounts by the legislature, requires substantial penalty.
¶58 The PRA was enacted by initiative "to ensure the sovereignty of the people and the accountability of the governmental agencies that serve them." Newman v. King County, 133 Wash.2d 565, 570, 947 P.2d 712 (1997). The act "reflects the belief that the public should have full access to information concerning the working of the government." Id. It requires agencies to provide "the fullest assistance to inquirers and the most timely possible action on requests for information." RCW 42.56.100.
¶59 The PRA's penalty provision is intended to "discourage improper denial of access to public records and [encourage] adherence to the goals and procedures dictated by the statute." Hearst Corp. v. Hoppe, 90 Wash.2d 123, 140, 580 P.2d 246 (1978). The legislature updated the initiative penalties to a $5-$100 per day penalty range, intending for innocent, good faith mistakes to fall at the low end and egregious, intentional misconduct to top the scale. Indeed, the purposes of the PRA are best served by "increasing the penalty based on an agency's culpability." Yousoufian v. Office of Ron Sims, 152 Wash.2d 421, 435, 98 P.3d 463 (2004).
¶60 In this case, King County's culpability is high. The trial court found the county was grossly negligent and had engaged in repeated acts of misrepresentation and deception. Armen Yousoufian's request was clear and unambiguous. It was time sensitive and *244 involved an issue of substantial public interestthe $300 million public financing of a sports stadium to be voted on by the public.
¶61 King County committed a series of noncompliant acts. It took over four years and the commencement of litigation for the county to fulfill a public records request that should have taken five days. The trial court found a lack of diligence, a lack of good faith, a lack of training, a lack of communication, a lack of coordination, and a lack of honesty. The court found no mitigating factors but substantial aggravating factors.
¶62 Although the court did not find King County acted in "`bad faith' in the sense of intentional nondisclosure," Clerk's Papers (CP) at 45, the court did find "the County was negligent in the way it responded to [Yousoufian's PRA] request at every step of the way, and this negligence amounted to a lack of good faith." CP at 46 (emphasis added). I doubt there is any difference between "a lack of good faith" and the presence of "bad faith" in the act, when the agency holds the records. In any event, I cannot find a reported PRA violation case more blatant than this one.
¶63 A high penalty is also necessary to deter King County (and others) from future noncompliance with the PRA. The trial court based its low $15 per day penalty on American Civil Liberties Union of Washington v. Blaine School District No. 503, 95 Wash. App. 106, 975 P.2d 536 (1999). Besides the facts of that case being drastically different from this one (involving the failure to mail rather than failure to produce requested records), it requires much more to deter the wealthiest county in the state than to impact a small town school district.
¶64 The peopleand the legislatureintended the penalty to reflect the degree of culpability. King County's repeated unresponsiveness, misrepresentations and incompetence, and over four year delay in fulfilling Yousoufian's clear and time sensitive public records request was a flagrant violation of the PRA. A per day penalty at or near $100 is necessary to punish King County's multiple acts of misconduct and to protect governmental transparency. With this direction, I concur.
I CONCUR: RICHARD B. SANDERS, Justice.
ALEXANDER, C.J. (concurring/dissenting).
¶65 I concur with the majority's conclusion that the trial court abused its discretion in setting the penalty at $15. I also agree with the portion of the opinion that provides guidance to trial courts faced with the issue of determining the amount of a penalty that a government agency should pay for failing to timely produce public records. I disagree, however, with the majority's direction to the trial court to impose a penalty "at the high end of the penalty range." Majority at 242. I cannot say, at this point, that the trial court would necessarily abuse its discretion by imposing a penalty outside of the upper range, provided the penalty exceeds $15. In my view, we should let the trial court exercise its considerable discretion to determine the penalty based upon a full consideration of the relevant factors the majority has identified in its opinion. The trial court is fully capable of doing this without any kibitzing from this court as to what the penalty should be.
OWENS, J. (dissenting).
¶66 Despite the fact that the penalty in this case was by all accounts the largest ever assessed under the Public Records Act (PRA), chapter 42.56 RCW,[1] the majority considers the award so inappropriately low as to require reversal of the trial court. While claiming to review the trial court for abuse of discretion, the majority effectively instructs the trial court to reach the majority's preferred conclusion. In the process, the majority also establishes a multifactor test that endangers trial judges' discretion in future cases. For these reasons, I respectfully dissent.

Abuse of Discretion
¶67 The PRA's mandate as to penalty calculations is simple: It is within the trial *245 judge's discretion to set the amount. "[I]t shall be within the discretion of the court to award [the prevailing plaintiff] an amount not less than five dollars and not to exceed one hundred dollars for each day that he or she was denied the right to inspect or copy said public record." RCW 42.56.550(4) (formerly RCW 42.17.340).
¶68 As the majority notes, a trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. Mayer v. Sto Indus., Inc., 156 Wash.2d 677, 684, 132 P.3d 115 (2006). A trial court's decision is "`manifestly unreasonable' if `the court, despite applying the correct legal standard to the supported facts, adopts a view "that no reasonable person would take."'" Id. (emphasis added) (quoting State v. Rohrich, 149 Wash.2d 647, 654, 71 P.3d 638 (2003) (quoting State v. Lewis, 115 Wash.2d 294, 298-99, 797 P.2d 1141 (1990))). A decision rests "on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard." In re Marriage of Littlefield, 133 Wash.2d 39, 47, 940 P.2d 1362 (1997).
¶69 Here, the trial judge certainly took a reasonable view. First, he carefully examined the particularities of this case. He recognized that "the issue in this case was of considerable public interest," Clerk's Papers (CP) at 127, but that Yousoufian did not suffer any personal economic harm as a result of the violation, CP at 126. He noted the preceding trial judge's findings of fact, including her conclusion that King County was "`negligent at every step of the way, and this negligence amounted to a lack of good faith.'" CP at 124. He also saw as significant the Court of Appeals finding "`that the county's violation of the PDA was due to poor training, failed communication, and bureaucratic ineptitude rather than a desire to hide some dark secret.'" CP at 124 (quoting Yousoufian v. Office of King County Executive, 114 Wash.App. 836, 853, 60 P.3d 667 (2003) (Yousoufian I), aff'd in part, rev'd in part, 152 Wash.2d 421, 98 P.3d 463 (2005) (Yousoufian II); appeal after remand, Yousoufian v. Office of Ron Sims, 137 Wash. App. 69, 151 P.3d 243 (2007) (Yousoufian III), review granted, 162 Wash.2d 1011, 175 P.3d 1095 (2008)).
¶70 Second, the trial judge aptly analogized this case to American Civil Liberties Union v. Blaine School District No. 503, 95 Wash.App. 106, 975 P.2d 536 (1999) (ACLU), in which the court awarded $10 per day to the plaintiff. In that case, the defendant school district did not merely refuse to mail documents responsive to the ACLU's request, as asserted by the majority. See majority at 238. There, as in this case, the government agency did not act in good faith. ACLU, 95 Wash.App. at 115, 975 P.2d 536. There, as here, the agency mischaracterized the size of the request and the time necessary to fulfill it. Id. at 113, 975 P.2d 536. There, as here, the agency displayed a lack of knowledge of its obligations under the PRA. Id. at 113-14, 975 P.2d 536. Additionally, the agency in ACLU patently contravened the purpose of the PRA when it stated that it did not wish to help the ACLU prepare a legal case against the government. Id. at 114, 975 P.2d 536. The trial judge concluded: "this court does not regard the County's conduct to be significantly more egregious than that of the school district in [ACLU]," and he awarded Yousoufian $15 per day for a total of $123,780. CP at 127. We cannot say that "no reasonable person would take" such a position; thus, the award was not "manifestly unreasonable."
¶71 Nor was the trial judge's decision based on untenable reasons. The majority's view that the penalty here was unreasonably low is grounded in its assumption that the per day penalty must be assessed on a sliding scale that metes out progressively higher penalty amounts from $5 to $100 based on the government's "culpability" level. Majority at 239, 240. On the contrary, the $5-$100 penalty range gives the trial court discretion to assess an appropriate penalty for the violation, given all the circumstances, including the number of penalty days and the level of culpability at different points in the penalty period.
¶72 By basing the daily award on a rigid culpability scale, the majority ignores the fact that the county's culpability levelwhat the majority calls "gross negligence"reflects *246 the totality of its actions over a five-year period. Majority at 236-37. In fact, the original trial court found that the county was "`negligent at every step of the way,'" CP at 124 (emphasis added), which apparently led the Court of Appeals to characterize the cumulative conduct as "grossly negligent," Yousoufian I, 114 Wash.App. at 853, 60 P.3d 667. The county's actions on the first day of the violation did not evince the same level of culpability as did its actions on the last day of the violation. The majority offers no support for its conclusion that the $15 daily assessment was an unreasonable value for the county's average daily misconduct over the penalty period.
¶73 Because we measure aggregate misconduct across the whole of the penalty period, our review requires us to consider the whole penalty, not the daily penalty in isolation. We cannot characterize an award as "high" or "low" based on the daily penalty alone because it is the daily assessment combined with the number of penalty days that reflects the total punishment the government actually receives. The $5-$100 daily penalty range reflects the trial court's discretion to set a more substantial daily penalty for less culpable action that occurs over a short period of time, thus still impressing the importance of the PRA on the offending government agency. By requiring the trial court to assess a high daily penalty for "grossly negligent" conduct, the majority deprives trial courts of their ability to consider the total award when deciding if the penalty is appropriate.
¶74 Our decision in Yousoufian II does not require trial courts to ignore the total number of penalty days when assessing a daily penalty. In that case, we held that a lack of good faith required something more than the absolute minimum award available under the PRA. Yousoufian II, 152 Wash.2d at 439, 98 P.3d 463. We went on to establish that the trial court's penalty calculation is a two-step process: first, to determine the number of penalty days; second, to determine the appropriate penalty. Id. at 438, 98 P.3d 463. This analysis requires the trial court to determine the length of the violation before it decides on a per day penalty, allowing the court to consider the length of the violation when determining the penalty. Even conceding that the conduct here was "grossly negligent" in the five-year aggregate, the trial court's award of $15 per day for a total of $123,780 was not manifestly unreasonable.
¶75 The purpose of the PRA penalty provision is to deter violations of the PRA. Id. at 429-30, 98 P.3d 463. The majority asserts that the trial judge failed to account for deterrent effect when he assessed a penalty only $5 per day higher than the ACLU penalty. The majority assumes that it may take a heftier penalty to deter a large county than it would to deter a small school district like the one in ACLU. However, the majority fails to consider the total award in concluding that the penalty will not properly deter the county. To evaluate deterrent effect, we must look at the total award because the per day penalty amount in isolation tells us nothing about the award's impact on the county. The majority offers no explanation for its conclusion that the total award of $123,780 would fail to serve the deterrent purpose of the PRA.[2]
¶76 Though some of us might have chosen to assess a higher penalty in this case, we review the trial judge's actions for abuse of his discretion, not for contravention of our own preferences. It is simply not our place to substitute our judgment for that of the trial judge. The trial judge's award$15 per day for a $123,780 totalshould stand.

The New 16-Part Standard
¶77 Having dismissed the trial court's decision without regard for trial court discretion, the majority goes on to create a 16-part test for penalty calculations, which it orders the trial court to employ on remand. The test endangers trial courts' discretion and will also prove unhelpful for litigants and courts alike.
¶78 The majority's new rule lists 16 factors for the trial court to consider in assessing *247 the county's culpability level, and it declares that "[the] guidance is not meant to limit [a] trial court's discretion." Majority at 239. But limit trial courts' discretion it will. Though the list of factors is "nonexclusive," trial judges still presumably must examine each of the 16 factors on the record. Id. at 240. This formulation provides appellate courts with opportunities aplenty to disregard trial judges' discretion, focusing on judges' strict compliance with the test, rather than their nuanced view of the entirety of each case (She failed to consider aggravating factor 7. He did not adequately address "training and supervision."). Id. at 240. And trial judges will only cautiously venture to add new factors to the list, never knowing whether this court will sanction those new factors. With the majority's imposition of a 16-factor test, we watch "abuse of discretion" review edge its way toward "de novo" review.
¶79 And at peril of trial judges' discretion, we gain very little. The new test is unhelpful for four reasons. First, the factors are cumulative. All of the mitigating factors and the first six aggravating factors are commonsense inquiries to measure the level of good faith or bad faith on the part of the county (Was the county honest? Was it helpful? Did it train its employees?). As such, these factors are subsumed completely in mitigating factor 3 ("good faith ... compliance") and aggravating factor 5 ("negligent, reckless, wonton, bad faith, or intentional noncompliance"). Id. Second, aggravating factors 7 and 8 ("potential for public harm" and "personal economic loss") tell us nothing about the county's blameworthiness unless we inquire whether the county knew of these risks. Id. Third, aggravating factor 9, deterrence, is a purpose of the penalty provision as a whole, not an indicator of the culpability of the county. In any event, deterrent effect can be effectively evaluated based only on the total award, not the per day award. Fourth, the test does little to assist in standardizing awards because it does not (and cannot) give trial courts guidance as to the relative weight of the factors. While the new test requires trial courts to march through a list of considerations, it leaves courts with little idea of what to do with the results. In my estimation, this test is not worth the risk it poses to trial judges' discretion.

The Majority's Application of Its 16-Part Test
¶80 Assuming for argument's sake that the majority's new 16-part test will give useful guidance to trial judges, the majority should allow the trial judge here to apply that test, pursuant to his own discretion. Instead, the majority applies the test itself and concludes that "a penalty at the high end of the penalty range" is "clearly require[d]." Majority at 241.
¶81 This approach turns the abuse of discretion standard on its head by requiring the trial judge to approximate a penalty award that we, in our discretion, deem optimal. The trial judge may no longer evaluate the factors as he sees fit, explaining why certain factors have differing relative weight and perhaps adding factors. His only choice now is to mimic our analysis and mirror our conclusion. If he doesn't choose an award amount large enough for our liking, we simply reverse him again, this time with the aid of the predetermined 16-part test analysis set forth in the majority.
¶82 Also, under the majority's characterization of the penalty range, the high end of the range is reserved for only the most egregious conduct. Here, there were no findings that the county acted in bad faith or intentionally withheld any documents; thus, King County's conduct here does not mandate a "high end" penalty.

Conclusion
¶83 We cannot say that "no reasonable person" would have ordered an award of $15 per day in this case. Thus, under true abuse of discretion review, the trial judge here did not abuse his discretion, and his determination should stand. Further, this court should refrain from imposing a cumbersome multifactor test that will jeopardize trial judges' discretion and at the same time assist appellate courts very little.
*248 WE CONCUR: BARBARA A. MADSEN, Justice, and KAREN G. SEINFELD, J. Pro Tem.
NOTES
[1] The legislature recodified the provisions in chapter 42.17 RCW pertaining to public records at chapter 42.56 RCW. This opinion refers to the new chapter by its preferred name, the "Public Records Act." RCW 42.56.020.
[2] At oral argument counsel for King County invited this court to calculate the penalty should this court decide the trial court abused its discretion. We decline counsel's invitation to determine an exact penalty as that is outside the authority of the PRA. See RCW 42.56.550(4) (granting discretion to determine the penalty to the court); see also Yousoufian v. Office of King County Executive, 152 Wash.2d 421, 431, 98 P.3d 463 (2005) (viewing discretion to calculate penalty rests with trial court not appellate court) (citing King County v. Sheehan, 114 Wash.App. 325, 350-51, 57 P.3d 307 (2002)).
[3] The dissent claims this two-step process "allow[s] the court to consider the length of the violation when determining the [per-day] penalty." Dissent at 246. But Yousoufian II does not support the proposition that the PRA allows a court to set a lower per-day penalty because an agency has continued to violate the act for a high number of days. According to Yousoufian II, "[t]he determination of days is a question of fact," while the PDA's purpose "is better served by increasing the penalty based on an agency's culpability...." 152 Wash.2d at 439, 435, 98 P.3d 463.
[4] In Yousoufian II, eight justices of this court agreed the statutory minimum penalty of $5 a day was insufficient and unreasonable considering the county acted with gross negligence. 152 Wash.2d at 439, 98 P.3d 463 (majority by Alexander, C.J.); id. at 440-41, 98 P.3d 463 (Fairhurst, J., concurring); id. at 441, 98 P.3d 463 (Madsen, J., concurring in part, dissenting in part); id. at 445-46, 98 P.3d 463 (Sanders, J., concurring in part, dissenting in part). It remains unclear why, if a penalty of $5 a day was an abuse of discretion then, some justices now think $15 a day is sufficiently different, given the conduct involved, and that the legislature set the maximum fine at $100 a day.
[5] Despite the dissent's insistence that the trial judge "aptly analogized this case to [ACLU]," we are not bound by opinions of the Court of Appeals. Dissent at 245. Similarly, the trial court should give more weight to Supreme Court precedent.
[6] Rather, we provide the considerations below to avoid a Yousoufian V, or similar protracted litigation. The dissent characterizes our guidance as a "16-part test" that "endangers trial courts' discretion and will also prove unhelpful for litigants and courts alike." Dissent at 246. But how then are trial courts and litigants supposed to avoid a Goldilocks-like scenario whereby appellate courts find penalties too low or too high but provide no meaningful guidance as to where, on a vast range, they should fall? Here, King County, the party against whom the penalty was assessed, is so ready to put this matter to rest that it asked this court to set the penalty.
[7] RCW 42.56.520 gives agencies five days to respond either by producing the documents, giving a time needed to produce the documents, requesting clarification of the request, or denying portions pursuant to exceptions. Furthermore, RCW 42.56.550(2) specifically grants the public the right to ask a court to review an agency's inaction if its estimate of the time needed to produce a record is unreasonable.
[8] Good faith, while not a shield against the imposition of a penalty, is a factor to be taken into account in setting the amount. Amren, 131 Wash.2d 25, 38, 929 P.2d 389.
[9] RCW 42.56.100 states that "rules and regulations shall provide for the fullest assistance to inquirers and the most timely possible action on requests for information." (Emphasis added.)
[10] While obvious, it bears repeating that delaying documents long past their ability to influence a public vote defeats the PRA's purpose of keeping people informed "so that they may maintain control over the instruments that they have created." RCW 42.56.030.
[11] RCW 42.56.550(3) states that records may not be withheld because they cause embarrassment to public officials.
[12] A flea bite does little to deter an elephant.
[13] The dissent argues the total penalty of $123,780 serves the PRA's deterrence purpose because, "The legislature did not intend to bankrupt government agencies with huge penalties, as evidenced by its imposition of a one-year statute of limitations for PRA claims." Dissent at 246 n. 2. First, the legislature added the one-year limitation in 2005, so it cannot be used as evidence of legislative intent several years earlier, when the violations occurred and Yousoufian filed suit. Second, even if the statute of limitations had been in effect then, Yousoufian would have met it, and the penalty amount would not have been affected. Third, the trial judge found King County could have responded to Yousoufian's request within five days, whereas the county was found to have violated the PRA over nearly four years. The dissent's argument seems counterintuitive: that the longer the flagrant violations continued, the smaller the per-day penalty should be.
[14] King County argues the historic significance of the penalty must be considered when determining the penalty. King County's argument evades the express language of the statute: "inconvenience or embarrassment" are irrelevant considerations under the PRA. RCW 42.56.550(3).
[15] In addition, we reverse the Court of Appeals' failure to strike portions of an amicus brief noncompliant with RAP 9.11 and RAP 10.3. See Spokane Research & Def. Fund, 155 Wash.2d at 98, 117 P.3d 1117; United States v. Hoffman, 154 Wash.2d 730, 735 n. 3, 116 P.3d 999 (2005).
[1] I also commend Judge Grosse of the Court of Appeals for a thoughtful effort to set forth factors for an analytical approach to be applied by trial courts.
[1] In 2005, the provisions in chapter 42.17 RCW pertaining to public records were recodified at chapter 42.56 RCW. LAWS OF 2005, ch. 275, § 1.
[2] In addition, the legislature's intent is not advanced by the majority. The legislature did not intend to bankrupt government agencies with huge penalties, as evidenced by its imposition of a one-year statute of limitations for PRA claims. See LAWS OF 2005, ch. 483, § 5(6).